**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

```
---------------------------------x
                                  :
MANSOOR AHMAD and NAVEED AHMAD,   :
                                  :
            Plaintiffs,           :
                                  :    Civil No. 3:12CV1307(AWT)
v.                                :
                                  :
YELLOW CAB COMPANY OF NEW LONDON  :
AND GROTON, INC., CONNECTICUT     :
DEPARTMENT OF TRANSPORTATION and  :
VEOLIA TRANSPORTATION SERVICES,   :
INC.,                             :
                                  :
            Defendants.           :
                                  :
---------------------------------x
```

<u>**RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**</u>

The plaintiffs, Mansoor Ahmad and Naveed Ahmad, bring this action against Yellow Cab Company of New London and Groton, Inc. ("Yellow Cab"), Connecticut Department of Transportation ("CTDOT") and Veolia Transportation Services, Inc. ("Veolia"). With respect to Yellow Cab, Mansoor Ahmad brings claims for disability discrimination in violation of the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. §§ 46a-60 <u>et</u> <u>seq.</u> (Count One), and the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §§ 12111 <u>et</u> <u>seq.</u> (Count Seven). Naveed Ahmad brings claims against Yellow Cab for retaliation in violation of CFEPA (Count Two) and the ADA (Count Eight).

1

Yellow Cab, the sole remaining defendant in this case,[1] moves for summary judgment on Counts One, Two, Seven, and Eight of the Complaint pursuant to Rule 56 of the Federal Rules of Civil Procedure.  For the reasons set forth below, the motion is being granted.

## I.   FACTUAL BACKGROUND

Plaintiff Naveed Ahmad is the father of plaintiff Mansoor Ahmad.  Each plaintiff leased his taxicab from Yellow Cab for $400 per week.  The plaintiffs held certificates issued by CTDOT which permitted them to work at Bradley International Airport ("Bradley Airport") in Windsor Locks, Connecticut.  Each plaintiff signed an Automobile Lease Agreement (the "Agreement") with Yellow Cab.  Each Agreement provides in pertinent part as follows:

> 2.   Lessor agrees to make available, at Lessee's request, telephone call service and radio service. However, Lessee shall not be required to accept any radio dispatch call other than those which he may of his own volition desire to accept; and further, Lessee shall not be restricted in any manner as to area in which he may operate said taxicab, nor shall he be required to remain in any specified place . . . . Lessee shall not be required to account to Lessor in any manner for the fares or other amounts received by the Lessee in connection with the operation of said taxicab . . . .
>
> 3.   The parties agree that during each lease period,

---

[1] Counts Five, Six, Eleven, and Twelve were withdrawn by plaintiff Mansoor Ahmad; the court previously granted Veolia's motion to dismiss with respect to Count Sixteen and CTDOT's motion to dismiss with respect to Counts Three, Four, Nine, Ten, Thirteen, Fourteen, and Fifteen.  (See Doc. Nos. 38 and 39.)

the vehicle shall remain in the exclusive custody and absolute control of the Lessee . . . .

4.   [T]he Lessee shall be solely responsible for the cost of towing or removal of any vehicle mired in mud or snow, or is otherwise disabled due solely to the negligence of the Lessee, while off the Lessor's premises.  Lessee will not repair the taxicab except at the places designated by the Lessor unless prior approval for such repair is given. . . .

. . .

7.   By this agreement, the Lessor and Lessee acknowledge and agree that there does not exist between them the relationship of employer-employee, principal []-agent, or master-servant, either express or implied, but that the relationship between the parties hereto is strictly Lessor-Lessee, the Lessee being the independent contractor, free from interference or control on the part of the Lessee in the operation of said taxicab, subject only to adherence to applicable statutes and ordinances of the State of Connecticut, County or Municipality in which the Lessee operates the equipment leased from Lessor. Lessee acknowledges that as an independent contractor, free from authority and control of Lessor, that he, the Lessee, is responsible for the payment of his own taxes, Federal and State; Social Security Taxes; Disability Taxes, and that no deductions will be made by the Lessor. . . .

. . .

10.  During the period when the vehicle is in the sole care, custody and control of the Lessee, the Lessee shall be solely liable and responsible for all fines and penalties imposed for parking or traffic violations, and the Lessee agrees to pay to the Lessor any of such fines and penalties incurred by Lessee.

11.  [O]nce the Lessee takes possession of the taxicab, he/she will exercise complete discretion

3

in the operation of same and in the performance of those duties generally recognized to be [a part] of performing taxicab services. Discretion in the operation of the said taxicab is vested in the Lessee, and the Lessor shall do no[] more than make available to Lessee telephone call service or radio service of prospective passengers. . . .

12. The Lessor agrees to lease taxicab to Lessee, who shall operate as an independent contractor, for day-to-day term . . . .

13. Under no circumstances shall the Lessee b[e] permitted to assign this lease agreement, or sub-lease said taxicab to any other person at any time.

(Naveed Ahmad Automobile Lease Agreement, Doc. No. 45-2; Mansoor Ahmad Automobile Lease Agreement, Doc. No. 45-3).

On June 10, 2011, the plaintiffs were in the taxicab line at Bradley Airport. A dispatcher employed by CTDOT and Veolia assigned a passenger with a service dog to Mansoor Ahmad. Mansoor Ahmad explained to the dispatcher that he had a dog phobia that prevented him from taking the assigned passenger, and he refused to transport the passenger. The dispatcher ordered Mansoor Ahmad to take his taxicab to the back of the line and summoned the police. The passenger was assigned to the next taxicab in line. The plaintiffs were arrested; Naveed Ahmad was charged with Interfering with Police, Refusal of Accommodation of Service Dog, and Misuse of 911 System; Mansoor Ahmad was charged with Interfering with Police and Refusal of Accommodation of Service Dog.

The plaintiffs' certificates were revoked by CTDOT. Yellow Cab reclaimed the plaintiffs' leased taxicabs on or about June 12, 2011. Mansoor Ahmad claims that Yellow Cab discriminated against him because of his disability and terminated his employment. Naveed Ahmad states that he objected to the actions taken against his son and explained to Yellow Cab that his son suffered from a dog phobia. He claims that his employment was terminated by Yellow Cab in retaliation for voicing his objection to Yellow Cab's treatment of Mansoor Ahmad.

## II.  LEGAL STANDARD

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the moving party as a matter of law. See Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1223 (2d Cir. 1994). Rule 56(a) "mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp., 477 U.S. at 322.

When ruling on a motion for summary judgment, the court must respect the province of the jury. The court, therefore,

may not try issues of fact.  See, e.g., Anderson v. Liberty
Lobby, Inc., 477 U.S. 242, 255 (1986); Donahue v. Windsor Locks
Bd. of Fire Comm'rs, 834 F.2d 54, 58 (2d Cir. 1987); Heyman v.
Commerce & Indus. Ins. Co., 524 F.2d 1317, 1319-20 (2d Cir.
1975).  It is well-established that "[c]redibility
determinations, the weighing of the evidence, and the drawing of
legitimate inferences from the facts are jury functions, not
those of a judge . . . ."  Anderson, 477 U.S. at 255.  Thus, the
trial court's task is "carefully limited to discerning whether
there are any genuine issues of material fact to be tried, not
to deciding them.  Its duty, in short, is confined . . . to
issue-finding; it does not extend to issue-resolution."  Gallo,
22 F.3d at 1224.

     Summary judgment is inappropriate only if the issue to be
resolved is both genuine and related to a material fact.
Therefore, "the mere existence of some alleged factual dispute
between the parties will not defeat an otherwise properly
supported motion for summary judgment . . . ."  Anderson, 477
U.S. at 247-48.  An issue is "genuine . . . if the evidence is
such that a reasonable jury could return a verdict for the
nonmoving party."  Anderson, 477 U.S. at 248 (internal quotation
marks omitted).  A material fact is one that would "affect the
outcome of the suit under the governing law."  Id.  As the Court
observed in Anderson: "[T]he materiality determination rests on

6

the substantive law, [and] it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs."  Id.  Thus, only those facts that must be decided in order to resolve a claim or defense will prevent summary judgment from being granted.  When confronted with an asserted factual dispute, the court must examine the elements of the claims and defenses at issue on the motion to determine whether a resolution of that dispute could affect the disposition of any of those claims or defenses.  Immaterial or minor facts will not prevent summary judgment.  See Howard v. Gleason Corp., 901 F.2d 1154, 1159 (2d Cir. 1990).

    When reviewing the evidence on a motion for summary judgment, the court must "assess the record in the light most favorable to the non-movant and . . . draw all reasonable inferences in its favor."  Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (quoting Delaware & Hudson Ry. Co. v. Consol. Rail Corp., 902 F.2d 174, 177 (2d Cir. 1990)).  Because credibility is not an issue on summary judgment, the nonmovant's evidence must be accepted as true for purposes of the motion.  Nonetheless, the inferences drawn in favor of the nonmovant must be supported by the evidence.  "[M]ere speculation and conjecture is insufficient to defeat a motion for summary judgment."  Stern v. Trustees of Columbia Univ., 131 F.3d 305, 315 (2d Cir. 1997) (internal quotation marks omitted) (quoting

Western World Ins. Co. v. Stack Oil, Inc., 922 F.2d 118, 121
(2d. Cir. 1990)).  Moreover, the "mere existence of a scintilla
of evidence in support of the [nonmovant's] position will be
insufficient; there must be evidence on which [a] jury could
reasonably find for the [nonmovant]."  Anderson, 477 U.S. at
252.

　　Finally, the nonmoving party cannot simply rest on the
allegations in its pleadings since the essence of summary
judgment is to go beyond the pleadings to determine if a genuine
issue of material fact exists.  See Celotex Corp., 477 U.S. at
324.  "Although the moving party bears the initial burden of
establishing that there are no genuine issues of material fact,"
Weinstock, 224 F.3d at 41, if the movant demonstrates an absence
of such issues, a limited burden of production shifts to the
nonmovant, who must "demonstrate more than some metaphysical
doubt as to the material facts, . . . [and] must come forward
with specific facts showing that there is a genuine issue for
trial."  Aslanidis v. United States Lines, Inc., 7 F.3d 1067,
1072 (2d Cir. 1993) (quotation marks, citations and emphasis
omitted).  Furthermore, "unsupported allegations do not create a
material issue of fact."  Weinstock, 224 F.3d at 41.  If the
nonmovant fails to meet this burden, summary judgment should be
granted.

## III. DISCUSSION

### A. ADA Claims (Counts Seven and Eight)

The ADA states, in pertinent part, that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability . . . ."  42 U.S.C. § 12112(a).  "The term 'covered entity' means an employer, employment agency, labor organization, or joint labor-management committee."  Id. § 12111(2).  The ADA's anti-retaliation provision states that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter . . . ."  Id. § 12203(a).  While the plain language of § 12203 suggests that its scope is broader than "covered entit[ies]" under § 12111(2), the Second Circuit has stated, in holding that § 12203 does not provide for individual liability, that while "the phrase 'no person shall' suggests the possibility of individual liability . . . § 12203 presents that rare case in which a broader consideration of the ADA . . . indicates that this interpretation of the statutory language does not comport with Congress's clearly expressed intent." Spiegel v. Schulmann, 604 F.3d 72, 79-80 (2d Cir. 2010) (internal quotation marks and brackets omitted).  Therefore, the ADA and the anti-retaliation provision apply only to discriminatory practices by an employer.  See Heller v. Consol. Rail Corp., 331 Fed. Appx. 766, 768 (2d Cir. 2009); see also

9

Anyan v. New York Life Ins. Co., 192 F. Supp. 2d 228, 238 (S.D.N.Y. 2002) ("Title VII and the other anti-discrimination employment statutes cover employees, not independent contractors.").

The Supreme Court applies the common law of agency to determine whether an individual is an employee or an independent contractor and has articulated thirteen factors that are to be considered.  See Cmty. for Creative Non-Violence v. Reid, 490 U.S. 730, 740 (1989) ("[W]hen we have concluded that Congress intended terms such as 'employee,' 'employer,' and 'scope of employment' to be understood in light of agency law, we have relied on the general common law of agency , rather than . . . the law of any particular State.").  The so-called Reid factors are as follows:

> [1] the hiring party's right to control the manner and means by which the product is accomplished ... [;][2] the skill required; [3] the source of the instrumentalities and tools; [4] the location of the work; [5] the duration of the relationship between the parties; [6] whether the hiring party has the right to assign additional projects to the hired party; [7] the extent of the hired party's discretion over when and how long to work; [8] the method of payment; [9] the hired party's role in hiring and paying assistants; [10] whether the work is part of the regular business of the hiring party; [11] whether the hiring party is in business; [12] the provision of employee benefits; and [13] the tax treatment of the hired party.

Eisenberg v. Advance Relocation & Storage, Inc., 237 F.3d 111, 114 (2d Cir. 2000) (quoting Reid, 490 U.S. 751-52).  While no

factor is dispositive, in the context of construing the meaning of the term "employee" under the ADA, the Supreme Court has stated that "the common-law element of control is the principal guidepost that should be followed" in determining whether an employer-employee relationship exists.  Clackamas Gastroenterology Assoc., P.C. v. Wells, 538 U.S. 445, 448 (2003).  "Under the common law test an employer-employee relationship exists if the purported employer controls or has the right to control both the result to be accomplished and the 'manner and means' by which the purported employee brings about that result."  Hilton Int'l Co. v. NLRB, 690 F.2d 318, 320 (2d Cir. 1982).

The Second Circuit has not yet addressed the right to control test in the context of taxicab drivers and lessors. However, other circuit courts have done so in the context of federal labor relations cases.  In NLRB v. Friendly Cab Co., Inc., 512 F.3d 1090 (9th Cir. 2008), the Ninth Circuit affirmed the NLRB's determination that a taxicab company's drivers who leased cabs from the company were employees rather than independent contractors.  While there were indicia of independent contractor status, i.e., the drivers did not work set hours or a minimum number of hours, the taxicab lease agreements provided that the drivers were independent contractors, the company did not provide any benefits to the

drivers, and the company did not withhold social security or other taxes on behalf of the drivers, the Ninth Circuit found that the indicia of independent contractor status were substantially outweighed by evidence of the company's significant control over the means and manner of its drivers' performance.  See id. at 1097-98.  The Ninth Circuit found, inter alia, that the company sought to control the means and manner of its drivers' work performance by exercising discretion to determine the model of vehicle assigned to a driver and whether a driver may drive an airport taxicab, by regulating their manner of driving, by imposing a strict disciplinary regime, by requiring drivers to carry advertisements without receiving revenue, by requiring drivers to accept vouchers subject to the company's "processing fees," by imposing a strict dress code, and by requiring training in excess of the requirements of governmental regulations.  See id. at 1099.  In City Cab Company of Orlando, Inc. v. NLRB, 628 F.2d 261 (D.C. Cir. 1980), the D.C. Circuit concluded that a taxicab company maintained sufficient control over the conduct of its drivers that they should be deemed employees where the company required its drivers to maintain a trip sheet, significantly regulated its drivers' work hours, substantially controlled passenger selection, had "goodwill" inure to the company's benefit, and prescribed an extensive dress code for its drivers.  See id. at

264-65.

In contrast, the Fourth Circuit in <u>Air Transit, Inc. v.</u> <u>NLRB</u>, 679 F.2d 1095 (4th Cir. 1982), concluded that a strong inference was created that a taxicab company did not exercise substantial control over the means and manner of its drivers' work performance where the stand fee drivers paid to the company for the privilege of participating in the feed line to pick up airport passengers was fixed and unrelated to the drivers' earnings; the drivers were not required to keep trip sheets or account for fares; the company had made no attempt to share in a percentage of the drivers' earnings; the drivers maintained their own vehicles and paid their own taxes and benefits; the drivers set their own hours; the drivers were not limited to where they choose to operate their taxicabs; and the contract specifically provided that the relationship created was one of independent contractor.  <u>See</u> <u>id.</u> at 1099-100.

Here, Yellow Cab contends that the plaintiffs were independent contractors rather than employees, and the evidence in the record supports that conclusion.  Each Agreement explicitly states that each plaintiff is an independent contractor and not an employee.  Under the terms of each Agreement, the plaintiffs were not required to accept any radio dispatch other than those they chose to accept; they were not required to account for fares to Yellow Cab; they had exclusive

custody and absolute control of their taxicabs; and they were solely responsible for the cost of towing and gasoline as well as responsible for all parking and traffic violation fines.  The only responsibility that Yellow Cab offered to assume under each Agreement was to make available telephone call service and radio service upon the plaintiffs' request.  While the terms of the Agreements are not dispositive, they do reflect the plaintiffs' understanding of their employment status and of the extent of Yellow Cab's control over their conduct as drivers at the time the plaintiffs signed their leases.

Moreover, the plaintiffs admitted the following:

- Yellow Cab did not control the number of hours the plaintiffs chose to work or the scheduling of those hours;

- Yellow Cab never required or requested that the plaintiffs file tax forms pertinent to withholding taxes on employment income, other than those applicable to independent contractors, and Yellow Cab never provided to the plaintiffs, nor did they request, any income tax forms, other than those applicable to independent contractors;

- the plaintiffs were not required to report traffic violations;

- the plaintiffs were not required to report their fares to Yellow Cab;

- they could accept or deny calls from Yellow Cab to pick up passengers;

- they would not receive compensation in any way from Yellow Cab for the work they chose to conduct utilizing the leased taxi cabs, and in fact, they did not receive any compensation from Yellow Cab;

14

- Yellow Cab did not offer or provide the plaintiffs any financial bonuses or incentives, social security insurance, life insurance, or health insurance;

- their obligation to pay their taxes, including Federal, State, Social Security and Disability, and that they did in fact do so where applicable;

- their obligation to reimburse Yellow Cab upon demand in the event Yellow Cab was called upon to pay any charges assumed by the plaintiffs, and that they did in fact do so where applicable;

- their responsibility for loss or damage to any goods or other property placed or carried in their leased taxicabs, and that they did in fact do so where applicable;

- their responsibility for the cost of towing or removal of their taxicabs;

- their responsibility to pay gasoline, and did in fact do so where applicable;

- their responsibility to pay all parking and traffic violation fines and penalties;

- their responsibility to inspect their leased taxicabs at the beginning of each lease term;

- they would test the brakes, steering, lights, signal lights, and other equipment; and

- they would clean their leased taxicabs at the end of each lease term.

Therefore, the evidence in the record shows, inter alia, that the plaintiffs paid a fixed fee to Yellow Cab to lease taxicabs, that the Agreements specifically provided that the relationship created is one of independent contractor, that Yellow Cab provided telephone call service and radio service to the plaintiffs, that the plaintiffs could accept or deny these

15

calls at will, that the plaintiffs were not required to report their fares to Yellow Cab, that the plaintiffs set their own hours, that Yellow Cab did not attempt to share in a percentage of the plaintiffs' earnings, and that Yellow Cab did not have a dress code for drivers.

Under similar circumstances in Air Transit, where drivers paid a fixed fee that is unrelated to their earnings, did not report their fares to the taxicab company, paid their own taxes and benefits, set their own hours, were not required to report their fares to the company, and the company did not share in a percentage of the drivers' earnings, the Fourth Circuit found that the drivers were independent contractors. See id., 679 F.2d at 1101.

Certain evidence with respect to whether Yellow Cab controlled the means and manner of the plaintiffs' work performance favors a finding here that there was an employer-employee relationship. The record reflects a factual dispute regarding whether Yellow Cab restricted the plaintiffs to an assigned work location, i.e., Bradley Airport. While the plaintiffs were not restricted in any manner as to where they operated their taxicabs under the terms of each Agreement,[2] the plaintiffs state that they were only allowed to pick up

[2] However, separate and apart from each Agreement, all taxicab drivers operating at Bradley Airport must operate their taxicabs in accordance with operating procedures promulgated by CTDOT.

16

passengers from Bradley International Airport.  In addition, the record shows that each plaintiff received a memo from Yellow Cab addressed to Bradley Airport drivers advising the drivers that they "cannot pick up a fare outside the airport and come back to the airport or drop anywhere else locally."  (Yellow Cab Memo, Doc. Nos. 45-2 and 45-3, at 9.)  The memo also advised Bradley Airport drivers that it was acceptable to provide taxi service to and from certain towns in Connecticut to all points in Connecticut or out of state.  Thus, there is a genuine issue as to whether Yellow Cab limited the plaintiffs to picking up passengers from Bradley Airport.  In Friendly Cab, the Ninth Circuit found it significant that the company had discretion in determining whether drivers could operate an airport cab.  See 512 F.3d at 1099.  Here however, Yellow Cab did not have comparable discretion in assigning the plaintiffs to work at Bradley Airport.  Rather, the plaintiffs were required to have certificates issued by CTDOT in order to work at Bradley Airport.  Even if Yellow Cab wanted the plaintiffs to work at Bradley Airport they could not do so without certificates from CTDOT.

Also, a limitation Yellow Cab placed on the plaintiffs' conduct as drivers was to require that the plaintiffs use Yellow Cab's mechanics in Waterbury for any car repairs.  In addition, under the terms of each Agreement, the plaintiffs were

17

prohibited from assigning their lease agreements or subleasing their taxicabs to another person.

However, viewing these three not particularly weighty factors in the context of the weighty and numerous factors that overwhelmingly indicate that the plaintiffs were independent contractors, the court concludes that there is no genuine issue as to the fact that Yellow Cab did not control the means and manner of the plaintiffs' work performance.

Therefore, the defendant's motion for summary judgment is being granted as to Counts Seven and Eight.

**B. CFEPA Claims (Counts One and Two)**

The plaintiffs contend that their CFEPA claims survive even without an employment relationship with Yellow Cab because the scope of Conn. Gen. Stat. §§ 46a-60(a)(4) and (a)(5) encompasses "any person" not just employers.

Conn. Gen. Stat. § 46a-60(a)(4) provides that it is a discriminatory practice "[f]or any person, employer, labor organization or employment agency to discharge, expel or otherwise discriminate against any person because such person has opposed any discriminatory employment practice or because such person has filed a complaint . . . ." Conn. Gen. Stat. § 46a-60(a)(5) provides that it is a discriminatory practice "[f]or any person, whether an employer or an employee or not, to aid, abet, incite, compel or coerce the doing of any act

18

declared to be a discriminatory employment practice . . . ."

While the Connecticut Supreme Court has recognized that §§ 46a-60(a)(4) and (a)(5) "apply to persons other than employers," Perodeau v. City of Hartford, 259 Conn. 729, 737-38 (2002), Connecticut federal and state courts have held only that supervisory employees or other employees may be held individually liable under §§ 46a-60(a)(4) and (a)(5). See, e.g., Spiotti v. Town of Wolcott, No. 3:04-cv-01442(CFD), 2008 WL 596175, at *1 n.1 (D. Conn. Feb. 20, 2008) (recognizing individual liability remains possible for supervisory employees under § 46a-60(a)(5)); Minder v. Town of Cheshire, 126 F. Supp. 2d 184, 203 (D. Conn. 2000) ("[R]ecovery against a supervisory employee may be cognizable under the retaliation provision contained in section 46a-60(a)(4) and under the aiding and abetting provision contained in section 46a-60(a)(5)."); Dombrowski v. Envirotest System, No. CV 980412518, 1999 WL 643394, at *2 (Conn. Super. Ct. Aug. 10, 1999) (holding that a cause of action under § 46a-60(a)(4) against an individual is permissible because "[c]onstruing the remedial provision of the CFEPA to allow supervisory employees to be held individually liable is the only way we can . . . ensur[e] that each and every citizen of this state is treated equally."); Kavy v. New Britain Bd. of Ed., No. CV 990492921S, 1999 WL 619587, at *6 (Conn. Super. Ct. Aug. 3, 1999) (holding that a cause of action under

§ 46a-60(a)(5) against individual employees is permissible).
Here, the plaintiffs have not claimed that Yellow Cab is a
supervisory employee nor alleged that it is another employee,
nor can they plausibly do so.  Moreover, the plaintiffs have not
cited to any authority for the proposition that a person who
does not fall into one of these categories can be held liable
under either § 46a-60(a)(4) or § 46a-60(a)(5).

Even assuming arguendo that Yellow Cab is covered by
§§ 46a-60(a)(4) or (a)(5), with respect to § 46a-60(a)(4), the
plaintiffs have proffered no evidence that could support a
conclusion that Yellow Cab reclaimed either plaintiff's leased
taxicab because he opposed a discriminatory employment practice
or filed a complaint, as opposed to because "[]Ahmad's decision
not to transport a person with service animal exposed the Yellow
Cab Company to civil penalties and was in violation of Federal
and Connecticut Law, DOT regulations, and Bradley Operating
Procedures. . . ."  (Yellow Cab's Response to Naveed Ahmad's
CHRO Complaint, Doc. No. 45-11, at 5; Yellow Cab's Response to
Mansoor Ahmad's CHRO Complaint, Doc. No. 45-12, at 5.)  With
respect to § 46a-60(a)(5), the plaintiffs have proffered no
evidence that could support a conclusion that Yellow Cab aided,
abetted, incited, compelled, or coerced either CTDOT or Veolia
to discriminate against plaintiff Mansoor Ahmad because of a dog
phobia.

Therefore, the defendant's motion for summary judgment is being granted as to Counts One and Two.

## IV.  CONCLUSION

For the reasons set forth above, the Defendant's Motion for Summary Judgment (Doc. No. 43) is hereby GRANTED. Judgment shall enter in favor of defendant Yellow Cab Company of New London and Groton, Inc. on Counts One, Two, Seven, and Eight of the Complaint.

The Clerk shall close this case.

It is so ordered.

Signed this 26th day of September 2014, at Hartford, Connecticut.

                                    _____/s/_____
                                    Alvin W. Thompson
                                    United States District Judge